IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No.: _____

CHRISTA ANN WILLIAMS,
as duly appointed  Administrator of
the ESTATE OF JOVONTAY
AVERY WILLIAMS,
                            Plaintiff,

v.


CITY OF CHARLOTTE;
OFFICER TIMOTHY ABRAMO,
individually  and in his official capacity;
OFFICER ZAVON JOSEPH
individually and in his official capacity;
OFFICER BRENTON THOMAS,
individually and in his official capacity;
and OFFICER JACOB GRIGG,
individually and in his official capacity,
                            Defendants.

---

## COMPLAINT

---

NOW COMES the Plaintiff, by and through counsel, and alleges and complains against

Defendants as follows:

### INTRODUCTION

1. In the early morning hours of June 13, 2022, Jovontay Avery Williams—a 32-year-old

    Black man—was in the midst of a mental health and substance-related crisis near

    Featherstone Drive in Charlotte, North Carolina. He was disoriented, frightened, and

    alone. Witnesses described Mr. Williams as behaving erratically, curled in a fetal position

    and screaming incoherently. He was unarmed. He made no threats. He was not resisting

or attempting to flee. CMPD officers—including Timothy Abramo, Zavon Joseph, Brenton Thomas, and Jacob Grigg—found him on the back porch of a residence. Instead of de-escalating, they surrounded him, forced him to the ground, handcuffed him behind his back, and pinned him face down in the dirt. He never stood a chance. Over the next several minutes, Mr. Williams gasped for air and repeatedly told officers he could not breathe. Still, they made no effort to reposition him or relieve pressure from his back. CMPD policy explicitly prohibits this kind of restraint because of the known risk of positional asphyxia. Medic EMS arrived at approximately 2:31 a.m. to find Mr. Williams still cuffed and unresponsive, with dilated, nonreactive pupils, shallow breathing, and a crashing blood pressure. Paramedics attempted resuscitation, including Narcan administration, but Mr. Williams never regained consciousness. He was pronounced dead later that morning. An independent autopsy commissioned by the family confirmed that Mr. Williams died from restraint asphyxia while in police custody. Mr. Williams' lungs were filled with fluid, his brain suffered hypoxic damage, and a deep contusion marked the front of his head. This was not a sudden overdose or unforeseeable tragedy. It was a preventable, restraint-induced homicide. Jovontay Williams died in the open, under the control of five trained officers who ignored his pleas, violated their own policies, and chose inaction as his life slipped away beneath them.

2. Officers, including Defendants Abramo, Joseph, Grigg, and Thomas, engaged in a prolonged prone restraint of Mr. Williams, while he was handcuffed behind his back, pressed face-down or on his side, and held down at the shoulder, torso, and ankles. While restrained, Mr. Williams repeatedly cried out that he could not breathe, said he was seeing double, feeling light-headed, and eventually fell unresponsive. EMS did not arrive for

over 22 minutes, by which point Mr. Williams had a  Glasgow Coma Scale (GCS) of 3, fixed dilated pupils, and ultimately died of positional asphyxia, per the family's autopsy. CMPD Directive 500-003 explicitly warns against prolonged prone restraint and instructs immediate repositioning once a subject is handcuffed.

3. This is a civil action seeking damages against individual officers of the Charlotte Mecklenburg Police Department (CMPD) who, while acting under color of law and within the scope of their employment, used excessive force—including prone restraint and pressure to the back—on Jovontay Avery Williams, causing his death by positional asphyxia. Despite known training and policy prohibitions, Defendants restrained Mr. Williams face down while handcuffed and failed to monitor his breathing, even after he became unresponsive.

## THE PARTIES

4. Plaintiff is the duly appointed Administrator of the Estate of Jovontay Avery Williams, a resident of Mecklenburg County at the time of his death. Plaintiff brings this action on behalf of the Estate.

5. Defendant City of Charlotte is a municipal corporation organized by charter under Chapter 160A of the North Carolina General Statutes. It maintains and operates pursuant to its charter a unified city-county police force called the Charlotte-Mecklenburg Police Department ("CMPD"). The City of Charlotte bears legal responsibility under state law for acts and omissions CMPD police officers in the course of their employment. Further, the City has expressly ratified the conduct of Defendants Abramo, Joseph, Thomas, and Grigg in this case.

6.  The City of Charlotte—an incorporated municipal "person" for purposes of 42 U.S.C. § 1983—is liable for the deprivation of Mr. Williams's Fourth and Fourteenth Amendment rights under *Monell* on multiple, independent grounds: **(1)** it promulgated and enforced CMPD Directive 500-003 (effective Nov. 19 2018), an express written policy that authorized the very prone-restraint practices that caused Mr. Williams's death. This official policy was the moving force behind the violations suffered by Mr. Williams.

7.  Defendant Timothy Abramo was at all times relevant a sworn police officer employed by the Charlotte-Mecklenburg Police Department and was acting under color of state law. He is sued in his individual capacity. Officer Timothy Abramo has been employed with the Charlotte-Mecklenburg Police Department since July 9, 2012. Upon information and belief, Timothy Abramo was an adult citizen and resident of Mecklenburg County.

8.  Defendant Zavon Joseph was at all times relevant a sworn police officer employed by CMPD and was acting under color of state law. He is sued in his individual capacity. Officer Zavon Joseph has been employed with the Charlotte-Mecklenburg Police Department since May 28, 2019. Upon information and belief, Zavon Joseph was an adult citizen and resident of Mecklenburg County.

9.  Defendant Brenton Thomas was at all times relevant a sworn police officer employed by CMPD and was acting under color of state law. He is sued in his individual capacity. Officer Brenton Thomas has been employed with the Charlotte-Mecklenburg Police Department since February 23, 2015. Upon information and belief, Brenton Thomas was an adult citizen and resident of Stanly County.

10. Defendant Jacob Grigg was at all times relevant a sworn police officer employed by CMPD and acting under color of state law. He is sued in his individual capacity.

Officer Jacob Grigg has been employed with the Charlotte-Mecklenburg Police Department since October 21, 2019.

11. Defendants Abramo, Joseph, Thomas, and Grigg are sued in their individual capacities under state law for assault and battery for engaging in a prolonged prone restraint of Mr. Williams, who was handcuffed behind his back, pressed face-down or on his side, and held down at the shoulder, torso, and ankles. Their conduct exceeded the scope of their lawful authority, was intentional and exhibited willful and wanton and reckless disregard for Mr. Williams's rights. Their conduct pierced any claim to public officer immunity she might invoke as to this individual capacity state law claim.

12. At the time of the incident, the Defendant officers were assigned to the North Tryon Division.

13. All acts or omissions alleged herein occurred in Mecklenburg County, North Carolina.

## JURISDICTION AND VENUE

14. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights), and 42 U.S.C. § 1983.

15. This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the acts and omissions giving rise to this action occurred in Mecklenburg County, North Carolina.

## FACTS

17. Jovontay Williams was a former All-American linebacker at Johnson C. Smith University. He was an All-Defensive Football Player of the Year for two consecutive years at JCSU.

18. Prior to the incident in June 2022, Mr. Williams did not have a history of any medical issues.

19. On Monday, June 13, 2022, Officer Abramo, Officer Joseph, Officer Thomas, and Officer Grigg were acting in their official capacity while responding to a discharge of firearm call for service at 324 Featherstone Drive.

20. At approximately 1:58 a.m., Defendant Officers Timothy Abramo, Zavon Joseph, Brenton Thomas, and Jacob Grigg (collectively, "Defendant Officers) with the Charlotte-Mecklenburg Police Department (CMPD) responded to a call at 324 Featherstone Drive in Charlotte, North Carolina.

21. Defendant Officers arrived at the scene around 2:01 a.m. and located 32-year-old Jovontay Avery Williams on the back porch of a residence.

22. Upon arrival, officers observed overturned plants on the front porch of 324 Featherstone Drive.

23. Mr. Williams appeared disoriented and in distress. Body-worn camera footage shows officers initially attempting to coax Mr. Williams off the porch. One officer pointed a firearm at Mr. Williams before advancing when it became clear Mr. Williams was not holding a weapon. Another officer then forcibly took Mr. Williams to the ground, restrained him in a prone position, and handcuffed him behind his back.

24. One officer is heard on BWC footage saying, "Yeah, he is stiffening up like a board."

25. The officers detained Mr. Williams, who was having an apparent medical emergency.

26. Upon information and belief, Officers requested MEDIC at approximately 2:13 AM to respond to the scene due to Mr. Williams' behavior.

27. Defendant Officers approached Mr. Williams, grabbed ahold of his arms, lowered him to the ground, and handcuffed him.

28. At this time, Defendant Officers placed Mr. Williams in a prone position while Mr. Williams was handcuffed behind.

29. Body worn camera ("BWC") footage shows the officers putting something under his head while he is lying on his side. Williams says, "Get me up," in one frame, and the officer responds to him, "We will get you up in a second."

30. Mr. Williams says, "Bruh, you an a–hole." He then yells, "I'mma die. I'm about to die. This is abuse. I'm about to die."

31. Viewers hear Williams say, "I feel lightheaded." He also tells officers through his delirium that he is seeing double and getting dizzy before saying again, "I'm about to die."

32. In one frame from the BWC footage, Williams says he "can't breathe" and is twisting as officers restrain him on his side. One officer replied, "Yes, you can."

33. Mr. Williams says, "You cops are dead wrong. If I die, it is on you."

34. Subdued on the porch, Williams says he is lightheaded and asks to be let go. One officer is heard encouraging him to take deep breaths. That officer says to another "he's stiffening up like a board." Amid periods of screaming and groaning, Williams occasionally spoke to the officers and asked them to get off him. At one point he says "let me up."

35. In the video, it is clear officers are tightly holding Williams' arms and legs while squatting beside him.

36. In the 'REPORT OF AUTOPSY EXAMINATION', completed by the North Carolina Department of Health and Human Services Office of the Chief Medical Examiner, the available law enforcement body camera footage was reviewed.

37. The Report of Autopsy Examination states, "at ~0214 the responding officers handcuffed Mr. Williams *behind his back while prone on the floor of the porch* and then positioned him on his right side *while restraining him, holding ankles, left shoulder, and left torso*. For a short time he was placed prone with an officer's hand on his back. Mr. Williams was observed moaning and again rolled to his right side, held down at the left shoulder/arm, lateral torso, and lower legs. He was moving and raising his head multiple times, cursing, and asking to get up. He continued yelling, stating that he felt light-headed and was seeing double."

38. The Report of Autopsy Examination goes on to state, "When the fire department (FD) arrived at ~0223, he continued yelling, exerting himself, and stating that he was seeing double and couldn't breath. He continued moaning and then settled down prior to EMS arriving to the scene. He was unresponsive and lethargic when EMS approached him at ~0235. EMS initiated assessment and treatment and requested removal of the handcuffs for transfer to the ambulance."

39. Upon information and belief, records show firefighters then called for an ambulance to respond non-emergency, meaning without lights and sirens.

40. The body camera video shows that firefighters did not check for a pulse on Williams and did nothing to ensure he was breathing properly.

41. On June 13, 2022, at approximately 2:31 AM, MEDIC arrived on the scene and began evaluating Mr. Williams.

8

42. Upon arrival, Medic 11 found Mr. Williams handcuffed and (R) lateral recumbent with a GCS of 3 and in severe respiratory distress. Rapid exam appreciated weak/tachycardic radial, lung sounds diminished with elevated RR/shallow Vt, and hot/diaphoretic skin.

43. At approximately 2:52 AM, paramedics placed Mr. Wiliams on a stretcher and transported him to Atrium Health University City. At 3:04 AM, the hospital staff notified officers that Mr. Wiliams was intubated due to labored breathing.

44. During the restraint, Mr. Williams repeatedly gasped, moaned, and told officers that he could not breathe. Despite these obvious signs of respiratory distress, officers failed to reposition him, assess his condition, or summon immediate aid. They continued to apply pressure to Mr. Williams's back while he was handcuffed and face down, even after he became unresponsive.

45. **Defendants knew that acute medical conditions, including Delirium, always require an appropriate medical response.**

46. Mr. Williams's death resulted from prolonged prone restraint while handcuffed, not from a neurological or psychiatric syndrome.

47. The **final autopsy report** issued by the family-retained forensic pathologist did not attribute Mr. Williams's death to excited delirium. Instead, the pathologist concluded: "*The cause of death in this Black male, Jovontay Avery Williams, is restraint asphyxia/positional asphyxia by the police while under the police restraint and custody*." (See Exhibit A).

48. There were no anatomic findings, toxicological levels, or documented behaviors to support a differential diagnosis of excited delirium. Mr. Williams exhibited lucidity,

9

followed verbal commands, and repeatedly articulated medical distress—reporting lightheadedness, seeing double, and inability to breathe.

49. At no point did Mr. Williams engage in sustained physical aggression, nor did he display signs of "superhuman strength," "imperviousness to pain," or "sudden collapse after struggle."

50. On the contrary, bodycam footage and EMS documentation reflect a steady decline in responsiveness, culminating in unresponsiveness and a Glasgow Coma Scale of 3 upon EMS arrival.

51. The Charlotte Mecklenburg Police Department adopted a Positional Asphyxia directive, effective November 24, 1992. (See Exhibit B).

52. CMPD's own Directive 500-003 and national training standards emphasize that subjects in medical distress—whether intoxicated, confused, or emotionally disturbed—must be closely monitored, promptly repositioned, and provided with urgent medical intervention. CMPD officers ignored these responsibilities even after Mr. Williams verbalized distress and ceased resisting.

53. Finally, bodycam and investigative timelines show that Mr. Williams waited 22 minutes for medical attention after CMPD's initial call for EMS. During that time, he was visibly deteriorating, yet officers failed to remove handcuffs, initiate aid, or declare a medical emergency.

54. Defendant Officers were to avoid placing a subject in a position that is likely to contribute to positional asphyxia.

55. Defendant Officers were prohibited from using control restraints while Mr. Williams was lying on his back/stomach.

56. CMPD requires that once a person is restrained, officers must reposition them promptly to reduce the risk of compressional or positional asphyxia.

57. CMPD Officers are required to actively assess for medical distress, not simply assume the subject is faking, uncooperative, or resting. This applies even when the person is vocal or moving, as labored breathing and moaning are red flags

58. CMPD Directive 500-003 references specific CMPD training on positional asphyxia, putting Defendant officers on clear notice of the risks, protocols, and expectations related to restraint-induced suffocation.

59. Defendant officers failed to de-escalate the situation despite being presented with a visibly confused, nonviolent individual. Officers gave inconsistent verbal commands and quickly resorted to hands-on force without:

   a. Using a crisis response team,

   b. Clarifying if Mr. Williams was armed,

   c. Establishing scene control or a designated monitor,

   d. Communicating roles during restraint.

60. The officers' collective failure to designate a medical responder or monitor breathing, despite clear policy and national awareness post-Floyd, created and escalated the threat they later responded to—i.e., Mr. Williams's respiratory distress and agitation from restraint.

61. There was no known criminal offense committed by Mr. Williams. There was no flight, and no weapon was visible when Defendant Officers restrained Mr. Williams.

62. Mr. Williams was unarmed, not actively resisting, and verbally engaging. He was seated, curled, or lying down for most of the interaction. Bodycam footage shows no sudden movements or aggression.

63. Resistance or Flight: Mr. Williams did not flee, and once restrained, his physical responses—moaning, lifting head, cursing—were consistent with distress, not resistance. His verbalizations ("I can't breathe," "seeing double") were medical symptoms, not combative behavior.

64. Mr. Williams posed no active threat, and officers had no objectively reasonable basis to believe continued pressure or restraint was necessary once he was cuffed.

65. The force used was involved multiple officers applying bodyweight, pinning Mr. Williams for over 10 minutes, and reapplying pressure after initial prone positioning.

66. CMPD policy (500-003) and national guidance (IACP, DOJ) warn that this type of force is dangerous and can cause compressional asphyxia—particularly in someone showing medical distress.

67. Less-lethal alternatives (monitoring, rolling him over, removing pressure) were available, feasible, and ignored.

68. Prolonged prone restraint on a handcuffed, unarmed, medically distressed individual was grossly disproportionate and directly caused death.

69. Mr. Williams repeatedly asked for help, which officers ignored or dismissed.

70. CMPD and CFD both failed to check pulse, initiate aid, or uncuff him for paramedics.

71. Post-incident statements (e.g., calling EMS "useless f**kers," insisting he was placed in a recovery position) are inconsistent with medical evidence and indicate a pattern of minimization rather than emergency response.

72. Body-worn camera footage captures progressive deterioration, verbal medical distress, and no active resistance.

73. The second autopsy confirmed restraint-induced asphyxia, with diffuse cerebral edema, subgaleal hemorrhage, and hemorrhagic pulmonary edema.

74. Medic documentation confirms GCS of 3, fixed pupils, and unresponsiveness.

75. No forensic evidence supports the claim of active resistance or danger. All objective data supports the claim of death by positional asphyxia due to continued restraint and inaction.

76. Defendant Officers cannot claim immunity when they use force against a suspect who is no longer a threat.

77. On June 13, 2022, Defendant officers had fair warning that:

    a. Continued prone restraint on a restrained, unarmed, distressed person is dangerous;

    b. Ignoring cries of "I can't breathe" is unlawful;

    c. Their own internal policy (500-003) prohibited this conduct.

78. At all relevant times the Charlotte-Mecklenburg Police Department ("CMPD") operated as an agency of the City of Charlotte, and the Chief of Police possessed final policymaking authority over officer training, use-of-force, prisoner restraint, and medical-response directives.

79. On November 19, 2018, CMPD promulgated Directive 500-003, *Management of Subjects With Mental Illness / Extreme Distress* ("2018 Directive"). The Directive was formally approved, published to the sworn force, and incorporated into mandatory training curricula; it therefore constitutes an official written policy of the City.  (See Exhibit C).

13

80. The 2018 Directive expressly authorized officers to employ prone restraint—including weight-bearing pressure to a subject's torso—*without* (a) imposing an objective time limit, (b) requiring an immediate transition to a recovery position, or (c) mandating the prompt removal of restraints and initiation of cardiopulmonary resuscitation when a subject became unresponsive.

81. The Directive further failed to require officers to summon advanced medical personnel *immediately* upon recognizing signs of respiratory compromise, and it contained no affirmative airway-protection safeguards for individuals exhibiting agitation, excited delirium, or positional asphyxia.

82. On June 13, 2022, Defendant officers, acting in strict conformity with the 2018 Directive, placed Mr. Jovontay Williams—an unarmed pre-trial detainee experiencing a behavioral-health crisis—in a prolonged prone position, applied body weight to his back and neck, and maintained that position despite visible respiratory distress. Mr. Williams suffered restraint asphyxia and died on scene.

83. Because the 2018 Directive affirmatively sanctioned the very restraint technique that caused Mr. Williams's death and omitted mandatory life-saving measures, the policy itself was the moving force behind the constitutional violations of the Fourth and Fourteenth Amendments. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

84. In direct response to the fatal incident, CMPD rescinded the 2018 Directive and, on December 8, 2023, issued a superseding Directive 500-003, *Response to a Mental Health Crisis* ("2023 Directive"). (See Exhibit D). The new Directive now:

    a. Requires officers to roll a restrained subject onto his side "as soon as it is safe,"

b. Mandates continuous airway monitoring, immediate removal of restraints, and commencement of CPR upon any loss of consciousness or breathing, and;

c. Requires the *immediate* dispatch of MEDIC/CFD to the scene and obligates officers to provide a detailed medical hand-off.

d. Requires CMPD employees who may be expected to come into contact with or communicate with a person in a mental health crisis to obtain documented refresher training *annually*, as opposed to obtaining documented refresher training at least every three years

85. The comprehensive revisions adopted in 2023 underscore that City policymakers knew or reasonably should have known that the 2018 Directive's omissions posed a substantial and obvious risk of death from restraint asphyxia, yet they allowed the policy to remain in effect until after Mr. Williams was killed.

86. By promulgating and enforcing the 2018 Directive, City policymakers directly caused the deprivation of Mr. Williams's clearly established constitutional rights, rendering the City of Charlotte liable under *Monell* for the resulting injuries and death.

**FIRST CAUSE OF ACTION**

<u>42 U.S.C. § 1983 – Excessive Force in Violation of the Fourth and Fourteenth Amendments</u>

87. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

88. Defendants Officers, acting under color of state law, in their individual capacities, deprived Decedent of rights, privileges, and immunities secured by the Constitution and laws of the United States, including those secured by the Fourth and Fourteenth Amendments to the Constitution, by, among other things, subjecting Decedent to

excessive force, including but not limited to, unnecessarily holding him on his chest after handcuffing, preventing him from breathing, causing him to asphyxiate and die.

89. Defendant Officers knew that Decedent's medical condition was serious, and they consciously disregarded his need for and access to medical care. They recklessly, with objective deliberate indifference, disregarded Decedent's serious medical condition and needs, including failing to move him into a recovery position after handcuffing, and failing to timely remove his handcuffs and initiate CPR, proximately causing his severe anoxic brain injury and consequent death.

90. Defendants subjected the Decedent to their wrongful conduct, depriving Decedent of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Decedent would be violated by their acts and/or omissions.

91. The conduct of the individual Defendants sued in their individual capacities entitles Plaintiff in her individual and representative capacities to punitive damages and penalties allowable under 42 U.S.C. § 1983.

92. On or about June 13, 2022, Defendant officers responded to reports of a shooting near Featherstone Drive.

93. Officers located Mr. Williams, who was injured, disarmed, and in a weakened state.

94. Instead of promptly rendering medical aid, Defendants restrained Mr. Williams in a prone position with his hands cuffed behind his back.

95. Despite CMPD's Directives Manual (Positional Asphyxia, 500-003), and well-recognized training prohibiting prolonged prone restraint, officers applied force to Mr. Williams' back, pinned him down, and failed to reposition him or monitor his breathing.

96. The force used was objectively unreasonable in light of the circumstances, violated

97. clearly established law, and directly caused Mr. Williams' death by positional asphyxia, as confirmed by autopsy.

98. As a direct and proximate result, Mr. Williams suffered physical pain, mental terror, and ultimately death.

99. Defendants' conduct was malicious, reckless, and in bad faith.

100.  Plaintiff seeks compensatory and punitive damages, and attorneys' fees under 42 U.S.C. § 1988.

## SECOND CAUSE OF ACTION

### Fourth Amendment – 42 U.S.C. § 1983 - Defendant City of Charlotte

101.  Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

102.  Plaintiff files this § 1983 claim against the City of Charlotte, a municipality, for its adoption and promulgation of a written directive that caused a constitutional violation.

103.  On November 19, 2018, CMPD adopted Directive 500-003 as official policy. It authorized prolonged prone restraint with weight-bearing force, without requiring timely repositioning, airway protection, CPR, or immediate medical intervention for subjects in distress.

104.  Defendant officers acted pursuant to that directive when they pinned Mr. Williams—unarmed and in crisis—in a prone position until he became unresponsive and died from restraint asphyxia.

105.  The 2018 Directive's omissions directly caused the constitutional violations. It remained in force despite known risks.

106. After Mr. Williams's death, CMPD rescinded the 2018 Directive and issued a revised Directive 500-003 on December 8, 2023, which now:

    a. Requires repositioning as soon as it is safe,

    b. Mandates airway monitoring and immediate CPR upon loss of consciousness,

    c. Orders rapid EMS dispatch and detailed medical handoff, and

    d. Requires annual refresher training for employees interacting with persons in mental health crisis (previously every three years).

107. These revisions confirm that CMPD policymakers knew or should have known the 2018 Directive posed a substantial and obvious risk of death, yet allowed it to remain in effect until after Mr. Williams was killed.

108. The City's promulgation and enforcement of the 2018 Directive caused the deprivation of Mr. Williams's clearly established constitutional rights, rendering it liable under *Monell*.

109. Plaintiff does not seek punitive damages from the City, as they are not available under § 1983.

110. Plaintiff seeks the costs of this action, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

### THIRD CAUSE OF ACTION

<u>North Carolina Common Law – Assault and Battery</u>

111. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

112. Defendants' use of force against Mr. Williams, including prone restraint and compression, without legal justification, constituted assault and battery.

113. Defendant Officers assaulted and battered Decedent, causing his death.

18

114. Defendant Officers are sued in their individual capacity on this claim. Their unjustified actions displayed willful and wanton disregard of Decedent's rights and well-being and exceeded the scope of their lawful authority, thereby piercing any entitlement to public officer immunity.

115. Defendant Officers acted with reckless disregard for Decedent's rights, and with malice and oppression such that punitive damages should be awarded to Plaintiff in her capacity as Decedent's personal representative.

## FOURTH CAUSE OF ACTION

<u>42 U.S.C. § 1983 – Deliberate Indifference in Violation of the Fourteenth Amendment</u>

116. This Count is brought against Defendant Officers in their individual capacities.

117. Defendant officers, while acting under color of state law, subjected Mr. Williams—a pretrial detainee—to objectively unreasonable treatment in violation of his rights under the Fourteenth Amendment to the United States Constitution.

118. At all times relevant, Mr. Williams was clearly in medical distress. He repeatedly stated he could not breathe, that he was seeing double, and that he felt lightheaded. Despite these clear indications of an emergent medical crisis, Defendants kept Mr. Williams handcuffed and restrained in a prone or lateral recumbent position, applying pressure to his body and failing to monitor his breathing or initiate care.

119. Body-worn camera footage and EMS documentation confirm that Defendants made no meaningful attempt to reposition Mr. Williams or to provide medical aid. They neither uncuffed him nor assessed his condition before EMS arrived. By the time paramedics reached him, he was unresponsive, had a Glasgow Coma Scale score of 3, and displayed

fixed, dilated pupils—signs of anoxic brain injury consistent with restraint-induced asphyxia.

120. CMPD's own directives and training materials—including Directive 500-003—clearly warn officers of the risks of positional asphyxia and prohibit prolonged prone or compressive restraint. These directives instruct officers to reposition restrained subjects promptly and monitor them for labored breathing, loss of consciousness, or distress—all of which were present here.

121. The conduct of Defendant Officers was not merely negligent—it was objectively unreasonable. Under the standard articulated in *Kingsley v. Hendrickson* and reinforced by *Short v. Hartman*, a pretrial detainee may establish a constitutional violation without proving subjective intent. It is sufficient to show that officers' actions or inaction in the face of known risks were objectively unreasonable.

122. Mr. Williams's death was not the result of an unpredictable medical event or sudden collapse; it was a slow, visible deterioration witnessed and ignored by trained law enforcement professionals. The risk of harm was obvious. The available alternatives—repositioning, de-escalation, medical monitoring—were known, feasible, and required. Defendants failed to employ any of them.

123. Accordingly, the actions and omissions of Defendants violated Mr. Williams's clearly established rights under the Fourteenth Amendment to be free from objectively unreasonable conditions of confinement and excessive risk of serious injury or death.

124. As a proximate result of each of these Defendants' deliberate indifference, Mr. Williams died.

JURY DEMAND

125.  Plaintiff requests that all matters be tried before a jury.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court:

A.    Award compensatory damages against all Defendants;

B.    Award punitive damages against all Defendants in their individual capacities;

C.    Award reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

D.    Grant such other and further relief as this Court deems just and proper.


This the 13th day of June, 2025.


Respectfully submitted,

*/s/ Micheal L. Littlejohn Jr.*
Micheal L. Littlejohn, Jr.
N.C. Bar No. 49353
Littlejohn Law PLLC
PO Box 16661
Charlotte, NC 28297
Telephone: (704) 322-4581
Fax: (704) 625-9396
Email: mll@littlejohn-law.com
**Counsel for Plaintiff**